NEWSOM, Circuit Judge: This case requires us to assess the interplay between the United States Bankruptcy Code and a Georgia statute that defines state-law property rights. For its part, the Code' describes a bankruptcy ¿state as including “all legal or equitable interests of the debtor in property as of the commencement of the case,” 11 U.S.C. § 541(a)(1), and goes on to provide, as relevant here, that a Chapter 13 plan can “modify the rights of holders of secured claims” on property in the estate, id. § 1322(b)(2), Meanwhile, Georgia’s “pawn” law states that any “pledged”—ie., pawned—item that is not “redeemed” within a statutorily prescribed grace period “shall be automatically forfeited to the pawnbroker by operation of [law], and any ownership interest of the pledgor ... shall be automatically extinguished in the pledged item.” Ga. Code Ann. § 44-14-403(b)(3). So how do these provisions interact? Very briefly, here’s the deal: The debtor in this case entered into a pawn transaction in which he pledged his car in exchange for a loan, defaulted on the loan by failing to repay it on time, and then, shortly before the expiration of the redemption period— during which he could pay off his debt (with interest) and thereby regain title to his car—filed a Chapter 13 bankruptcy petition. Even though the Bankruptcy Code extended the debtor’s state-law grace period an additional 60 days, he still failed to redeem the car. All agree that because the debtor filed for bankruptcy before the grace period lapsed, the car and the associated right of redemption initially became part of the bankruptcy estate pursuant to Section 641(a)(1). But this case presents the following interesting question: Did the filing of the bankruptcy petition necessarily freeze those assets in the estate just as , they were, such that at confirmation the pawnbroker remained a mere “holder[ ] of [a] secured claim” whose “rights” the bankruptcy court could “modify” under Section 1322(b)(2)—here, by extending the repayment schedule? Or instead, even after the petition’s filing, did Georgia’s pawn statute continue to operate in the background, so to speak, such that upon the expiration of the redemption period, the car was “automatically forfeited to the pawnbroker by operation of [law]” and thus ceased to be property of the estate, leaving no bankruptcy-based “claim” or “right” to be “modified]”? Mindful of the deference owed to state-law definitions and regulations of property rights—even in this heavily “federal” area of law—-we hold that the Bankruptcy Code did not forestall the “automatic! ]” operation of Georgia’s pawn statute, that the car dropped out of the bankruptcy estate (and vested in the pawnbroker) when the prescribed redemption period lapsed, and, accordingly, that with respect to the car, Section 1322(b)(2) had no field of operation. Simply put, following the expiration of the grace period, the pawnbroker didn’t have a mere “claim” on the debtor’s car— it had the car itself. I On September 2, 2015, Gustavius Wilber and TitleMax entered into a pawn transaction under Georgia law, see Ga. Code Ann. § 44-14-403, in which Wilber exchanged the certificate of title on his 2006 Dodge Charger for a $4,400 cash advance.[1] Because pawn transactions are nonrecourse loans, Wilber had no firm obligation to repay the advance or to redeem the Charger; rather, if Wilber failed to pay off the loan with interest, TitleMax simply took the car. See Ga. Code Ann. § 44-14-403. Wilber’s pawn transaction matured on October 2, 2015, by which point he had to repay his loan in order to regain title to his car. Wilber failed to repay the loan by its maturity date. Georgia law, though, gives a defaulting debtor in a motor-vehicle pawn transaction a 30-day grace period during which he can redeem his car. See id. § 44-14-403(b)(1). Here, on October 30, just before his redemption period was set to expire on November 2, Wilber—still in possession of the Charger[2]—filed a petition for relief under Chapter 13 of the United States Bankruptcy Code. Wilber simultaneously filed his Chapter 13 plan, which listed TitleMax as a creditor holding a secured claim on the Charger. Pursuant to 11 U.S.C. § 108(b), the Bankruptcy Code extended Wilber’s state-law grace period an additional 60 days from the date of his petition, giving him until December 29 to redeem the car. The extended expiration date came and went with no redemption. On January 8, 2016, before the bankruptcy court held a confirmation hearing on Wilber’s proposed plan, TitleMax filed a motion for relief from the Code’s automatic-stay provision, 11 U.S.C. § 362(a), so that it could recover the Charger, which Wilber still had in his possession. In the motion, TitleMax contended that Wilber’s bankruptcy estate no longer included the car because Wilber had failed to redeem it within the extended grace period. The bankruptcy court conducted confirmation hearings on January 21 and February 2, and then on February 9—with Title-Max’s motion for relief from the stay still pending—entered an order confirming Wilber’s Chapter 13 plan. The confirmed plan treated TitleMax as a creditor on a $5,036 debt secured by a claim on the Charger, and provided for repayment of the pawn loan at a 5% interest rate in installments of $175 per month. Following confirmation, the parties continued to litigate TitleMax’s earlier-filed motion for relief from the automatic stay, and on April 29, 2016, the bankruptcy court entered a final order denying that motion. Rejecting TitleMax’s arguments, the court held (1) that the Charger and the redemption right were property of Wil-ber’s bankruptcy estate, and remained so even after the expiration of the Code-extended grace period, and accordingly (2) that TitleMax didn’t own the car itself, but rather continued to hold only a secured “claim” on it, which gave rise to repayment “rights” that could be “modif[ied]” under Section 1322(b)(2), In re Wilber, 551 B.R. 542, 544-47 (Bankr. M.D. Ga. 2016). The bankruptcy court separately (and alternar tively) concluded that under 11 U.S.C. § 1327(a) and “[t]he doctrine of res judica-ta,” the order confirming Wilber’s Chapter 13 plan precluded any relief for TitleMax, which the court said had “slept on its rights by not timely objecting” to confirmation. Id. at 547-48. The district court affirmed the bankruptcy court’s decision on the merits, without addressing the “res judicata” issue. In particular, the district court “agree[d] with the bankruptcy court’s conclusion” that “because the vehicle[ was] part of the debtor[’s] estate[ ] when the debtor[ ] filed [his] Chapter 13 petition[ ], Title Max held [a] secured elaim[] in the vehicle[] that could be modified under 11 U.S.C. § 1322(b)(2).” Title Max v. Northington, 559 B.R. 542, 545 (M.D. Ga. 2016). TitleMax timely appealed to this Court, challenging the district court’s affir-mance of the order denying its motion for relief from the automatic stay. TitleMax’s appeal presents questions of law, which we review de novo. See In re Paschen, 296 F.3d 1203, 1205 (11th Cir. 2002) (internal citations omitted). II Before jumping into the merits, we must first address the bankruptcy court’s alternative (but logically antecedent) holding that TitleMax’s challenge is procedural^ barred on “res judicata” grounds. The bankruptcy court held that Title-Max “slept on its rights” by “fail[ing] to timely object to confirmation” of Wilber’s proposed Chapter 13 plan. 551 B.R. at 548. Accordingly, the court held that its confirmation order was conclusive under 11 U.S.C. § 1327(a)—which generally binds a debtor and his creditors to the terms of a confirmed plan—and “[t]he doctrine of res judicata.” 551 B.R. at 548. In the particular circumstances of this case, we cannot agree that TitleMax im-permissibly “slept on its rights” and thus forfeited its ability to raise the argument that it presents on appeal. The decision that the bankruptcy court cited for support, In re Young, 281 B.R. 74 (Bankr. S.D. Ala. 2001), provides a useful (and stark) contrast. As in this case, the debtors in Young failed to redeem property that they had pledged to a pawnbroker. And as in this case, the bankruptcy court held a hearing on the debtors’ proposed Chapter 13 plan—which listed the pawnbroker as the creditor on the pawn debt—and later entered an order confirming the plan. The pawnbroker in Young, however, did absolutely nothing to preserve its argument that it had rightful title to the pawned property. It didn’t “participate in the confirmation [hearing],” nor did it in any way contest the plan’s consummation; rather, following confirmation, the pawnbroker simply set out, unilaterally, to sell the pawned property, prompting the debtors to file a motion to enforce the automatic stay. See id. at 76, 80. Here, by contrast, even before the bankruptcy'court held a confirmation hearing, and thus by definition before it entered any confirmation order, TitleMax filed a written motion in which it contended—just as it does here—that at the moment Wil-ber failed to redeem the Charger pursuant to Georgia’s pawn statute, the car ceased to be property of the bankruptcy estate. TitleMax then appeared at the hearing, and later filed post-hearing briefs, to reiterate its position. When the bankruptcy court later denied its motion for relief from the automatic stay, thereby bringing the bankruptcy proceeding to a close, Tit-leMax appealed directly to the district court and then, following that court’s affir-mance, directly to this Court. Our dissenting colleague, who would affirm on res-judicata grounds, is of course quite right to say that TitleMax had “to take some action” in order to preserve its position that the car dropped out of the estate upon the expiration of the redemption period. Dissenting Op. at 1318 n.2. The question is precisely what form that “action” had to take. The dissent repeatedly protests that TitleMax didn’t formally “object” to the confirmation of Wilber’s Chapter 13 plan. See, e.g., Dissenting Op. at 1317, 1318, 1319, 1321, 1322. That’s true—no one denies it, and TitleMax freely admits it.[3] We hold, though, that on the unique facts of this case, TitleMax was not required to file an “Objection”—styled as such—but rather adequately preserved its position through its pre-confirmation motion for relief from the automatic stay, which it briefed and argued to the bankruptcy court. First, as a practical matter, there is no substantive difference between the styled-as-such “Objection” .that the dissent would seemingly require and the motion for relief that TitleMax actually filed. As Wilber’s counsel candidly acknowledged at oral argument, “the body of [TitleMax’s motion] was exactly what they needed for an objection to confirmation.” Oral Arg. Tr. at 20:38. “They could’ve changed the title” of the pleading, he said, “and not had to change anything else other than the request for the relief.” Id. The parties thus agree that TitleMax put the substance of its position—namely, that the Charger ceased to be estate property when the redemption period lapsed—squarely before the bankruptcy court,[4] Second, as a legal matter, in the circumstances presented here, TitleMax didn’t need to file a styled-as-such “Objection” in order to preserve its position that the Charger ceased to be estate property upon the expiration of the redemption period; rather, that argument was adequately teed up (just as TitleMax presented it) in a motion for relief from the stay. Cf. In re Boyd, 11 F.3d 59, 60 (5th Cir. 1994) (holding that even where a Chapter 13 plan was confirmed without a formal objection, a creditor’s motion for relief from the stay adequately preserved its argument that disputed property was not properly part of the bankruptcy estate).[5] TitleMax filed its motion pre-confirmation, making exactly the same argument and seeking exactly the same relief that it does here. When the bankruptcy court rejected its argument and denied its motion, TitleMax took an appeal directly to the district' court and then, folio-wing that court’s affirmance, came straight to this Court.[6] We 'hold that in the particular (and peculiar) factual and procedural posture in which this case arises, TitleMax did enough to preserve its position. We turn, then, to an evaluation of the merits. Ill The district court explained its decision on the merits in two parts. Initially, the court observed, “when [Wilber] filed [his] Chapter 13 petition[], the vehicle[ was] part of [his] bankruptcy estate[ ] and Title Max held [a] secured daim[]” in it. 559 B.R. at 546. Accordingly, the court concluded, because the Bankruptcy Code provides in 11 U.S.C. § 1322(b)(2) that “a Chapter 13 plan may ‘modify the rights of holders of secured claims’ ... the bankruptcy court was authorized to modify Title Max’s claim[] as it did....” Id. The district court skipped an important step—a mistake that our dissenting colleague largely repeats—and it is that step on which this appeal largely turns. In order to hold (as the district court did) that Wilber’s Chapter 13 plan could modify TitleMax’s rights, it would be necessary not only to conclude (as the district court did) that the Charger initially became part of Wilber’s bankruptcy estate with the filing of his petition, but also to find (as- the -district court did not) that it remained in the estate even after the expiration of the prescribed redemption period. We agree with the district court that the- Charger entered Wilber’s estate, but we hold that it dropped out—pursuant to the “automatic[ ]” operation of Georgia’s pawn statute—when the grace period lapsed. A We can make quick work of the first issue. Section 541 of the Bankruptcy Code specifies the property interests that constitute the bankruptcy estate. 11 U.S.C. § 541. In relevant part, Section 541 states that a debtor’s estate comprises “all legal or equitable interests of the debtor in property as of the commencement of the case.” Id. at (a)(1). As used in Section 541(a)(1), the term '“commencement” means the date on which the debtor filed his bankruptcy petition. See 5 Collier on Bankruptcy ¶ 541.02 (16th ed. 2017). TitleMax concedes, and the parties thus agree, that “on October 30, 2015—the date he filed his bankruptcy petition—Wil-ber retained property interests in the Charger that became ‘property of the estate’ under 11 U.S.C. § 541.” Br. of Appellant at 10. In particular, the parties agree that the car, which remained in Wilber’s possession, as well as the associated right to redeem it—which at that time had not yet expired—entered the estate with the filing of his petition. Id. at 8 (referring to the “right to possess” and the “right to redeem” as “property interests related to the Charger that ... entered the bankruptcy estate”). That all seems right to us. The Supreme Court has observed that “§ 541(a)(l)’s scope is broad,” United States v. Whiting Pools, 462 U.S. 198, 204, 103 S.Ct. 2309, 76 L.Ed.2d 515 (1983), and existing precedent supports the parties’ shared view that both the Charger and the right of redemption became estate assets upon the filing of Wilber’s bankruptcy petition. See In re Lewis, 137 F.3d 1280, 1284 (11th Cir. 1998) (stating that a debtor’s “statutory right of redemption in the automobile became ‘property of the estate’ under 11 U.S.C. § 541(a)(1) at the commencement of the case”); In re Moore, 448 B.R. 93, 100 (Bankr. N.D. Ga. 2011) (finding that debtors’ vehicles entered the estate where, as here, the debtors “had possession of the pawned vehicles at the time of the bankruptcy filing and the grace periods for their redemptions had no( yet expired”). But—and it’s a big but-—contrary to the district court’s (implicit) determination, finding that the car and the redemption right were initially made part of Wilber’s bankruptcy estate doesn’t end the inquiry. The controlling question isn’t whether Wil-ber’s property interests in the Charger entered the bankruptcy estate in the first instance—they did—but rather whether, despite the expiration of the prescribed grace period, those assets remained in the estate at the time of confirmation, such that TitleMax’s rights in them could be “modif[ied]” under Section 1322(b)(2). That is the issue to which we now turn. B The parties have clearly joined issue on the question whether an asset that is initially made part of a bankruptcy estate must necessarily remain there, irrespective of the underlying state law that defines it—or whether, instead, the ordinary operation of that state law can (for reasons wholly separate from the bankruptcy) cause the asset to drop out of the estate. For its part, TitleMax insists that “[n]o principle of bankruptcy law requires that a debtor’s bankruptcy estate be frozen in time where a debtor’s state-law interest in property is divested after the date of filing.” Br. of Appellant át 10. Wilber rejoins, precisely to the contrary, that “it is clear that the estate is in fact ‘frozen in time’ as of the filing of the case.” Br. of Appellee at 5. The battle lines thus clearly drawn, we must decide whether the filing of a bankruptcy petition necessarily freezes the debtor’s estate and thereby forestalls the operation of the state-law rules that define and regulate the property interests that comprise that estate. 1 In assessing this question, we begin with an important stage-setting observation: Even in the uniquely “federal” bankruptcy context, “[pjroperty interests are created and defined by state law.” Butner v. United States, 440 U.S. 48, 55, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979); accord, e.g., Barnhill v. Johnson, 503 U.S. 393, 398, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992) (observing that, as a general matter, “ ‘property’ and ‘interests in property” are creatures of state law”). Particularly significant for present purposes, this Court has emphasized that although “whether an interest of the debtor[ ] is property of the estate is a federal question,” “the nature and existence of the debtor[’s] right to property is determined by looking to state law.” In re Thomas, 883 F.2d 991, 995 (11th Cir. 1989). Accordingly, analyzing a bankruptcy estate requires two tiers of inquiry, first into the assets of the estate, and then into the underlying property rights and interests that constitute each asset—first, that is, into the estate’s contents, and then into the contents of the contents. The second, more granular inquiry—into the nature of a debtor’s property interest in a particular estate asset—turns on state law. See Butner, 440 U.S. at 54, 99 S.Ct. 914 (“Congress has generally left the determination of property rights in the assets of a bankrupt’s estate to state law.”); In re Smith, 85 F.3d 1555, 1557 (11th Cir. 1996) (“The property rights of a debtor in a bankruptcy estate are defined by state law.”); Norton Bankruptcy Law and Practice § 61.3 (3d ed. 2016) (“State law determines the existence, nature, and extent of any property interests a debtor may have.”). With respect to the particular estate asset at issue here—Wilber’s pawned Charger—the applicable state law is crystal clear: Under Georgia’s pawn statute, “[pledged goods not redeemed within the grace period shall be automatically forfeited to the pawnbroker ... and any ownership interest of the pledgor or seller shall automatically be extinguished as regards the pledged item.” Ga. Code Ann. § 44-14-403(b)(3) (emphasis added). All agree that under Section 44-14-403(b)(3)’s plain terms, the expiration of the redemption period is conclusive—the debtor loses title to his pawned property, which vests immediately and by operation of law in the pawnbroker. Indeed, at oral argument, Wilber’s counsel acknowledged that but for the bankruptcy “stepp[ing] in,” TitleMax “would have had th[e] car” and Wilber would have had “no recourse.” Oral Arg. Tr. at 24:50. The question presented here is whether federal bankruptcy law changes all that, prevents the ordinary and “automatic” operation of Georgia’s pawn statute, and prohibits title to the Charger from passing, as it otherwise would, from Wil-ber to TitleMax.[7] To be clear, we are not concerned here with congressional power; Congress has extensive authority in the bankruptcy arena—including the authority to supersede state property law. See U.S. Const. Art. I, § 8, cl. 4. Rather, the issue before us is whether Congress has in fact exercised that authority. In answering that question, we take our cue from the Supreme Court’s decision in BFP v. Resolution Trust Corp., 511 U.S. 531, 114 S.Ct. 1757, 128 L.Ed.2d 556 (1994). There, the Court considered the meaning of Section 548 of the Bankruptcy Code, which empowers a bankruptcy trustee to set aside “constructively fraudulent transfers,” including an insolvent debtor’s sale of property, within one year before filing bankruptcy, for less than “reasonably equivalent value.” 11 U.S.C. § 548(a)(2). The particular issue before the Court in BFP was whether the term “reasonably equivalent value” should be read to imply a “fair market value” benchmark—or whether, instead, the statutory term should be understood by reference to the underlying state law, such that the price fetched at a foreclosure sale conducted in accordance with applicable state procedures would conclusively establish the property’s “reasonably equivalent value.” In opting for the latter rule, the Court made several observations that guide our analysis here. First, the Supreme Court explained that “[a]bsent a clear statutory requirement to the contrary,” courts interpreting the Bankruptcy Code “must assume the validity of th[e] state-law regulatory background” at issue “and take due account of its effect.” 511 U.S. at 539, 114 S.Ct. 1757. In BFP, the underlying state law was one that permitted a mortgagee to unload property at a forced sale, and that law’s “effect” was that “property that must be sold within those strictures is simply worth less” than it would be on the open market. Id. (emphasis in original). Here, the Georgia pawn statute’s “effect" is that following expiration of the prescribed redemption period, a debtor’s rights in the pledged property are “automatically forfeited,” “extinguished,” and vested in the pawnbroker. Second, and relatedly, the BFP Court emphasized that before a federal statute—notably including the Bankruptcy Code—may be read to “displace traditional state regulation,” the “federal statutory purpose must be ‘clear and manifest.’” Id. at 544, 114 S.Ct. 1757 (quoting English v. General Elec. Co., 496 U.S. 72, 79, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)). Significantly for present purposes, just as the states have historically regulated the sorts of mortgage-foreclosure transactions at issue in BFP, see id. at 540-43, 114 S.Ct. 1757, they have long regulated pawn transactions, see, e.g., Lockwood v. Muhlberg, 124 Ga. 660, 53 S.E. 92 (Ga. 1906); cf. also Asakura v. City of Seattle, 265 U.S. 332, 343, 44 S.Ct. 515, 68 L.Ed. 1041 (1924) (“In this country, the practice of pledging personal property for loans dates back to early colonial times, and pawnshops have been regulated by state laws for more than a century.”). Finally, and again in a similar vein, the Court in BFP clarified that while it is not strictly necessary for Congress to “override historical state practice expressly or not at all,” and that the Bankruptcy Code can supersede state-law property rules “by implication,” it may do so only “when the implication is unambiguous.” BFP, 511 U.S. at 546, 114 S.Ct. 1757 (internal quotation marks omitted). “[W]here the intent to override is doubtful,” the Court stressed, “our federal system demands deference to long-established traditions of state regulation.” Id. To be sure, BFP is not quite on all fours—it addressed a different section of the Code, and it dealt with mortgage foreclosures rather than pawn transactions. But its upshot for this case is clear. Given the acknowledged background principle at work here—namely, that property is created and defined by state law—we should hold that the Bankruptcy Code prevents and counteracts the ordinary operation of Georgia’s pawn statute only if we find some clear textual indication that Congress intended that result. As explained below, we don’t. 2 At first blush, the likeliest candidate to accomplish the “freezing” that Wilber’s position entails might seem to be the Bankruptcy Code’s automatic-stay provision, 11 U.S.C. § 362(a). As it turns out, though, Section 362(a) has no application to the particular circumstances of this case. Section 362(a) states that a bankruptcy petition “operates as a stay, applicable to all entities,” of assorted acts and occurrences, including (1) the “commencement or continuation” of certain “judicial, administrative, or other' action[s] or proceeding[s],” (2) the “enforcement” of certain pre-petition “judgments],” (3) any “act to obtain possession of property of the estate,” (4) any “act to create, perfect, or enforce” pre-petition liens, and (5) any “act to collect, assess, or recover” a pre-petition claim against the debtor. Id, In so doing,' we have said, the automatic stay “relieves the debtor from financial pressure during the pendency of bankruptcy proceedings” and “protects creditors by preventing the premature disbursement of the bankruptcy debtor’s estate.” Carver v. Carver, 954 F.2d 1573, 1576 (11th Cir. 1992). Although Wilber doesn’t particularly press the position, some courts considering cases like this one have held that following a bankruptcy petition’s filing, the automatic-stay provision applies to toll an as-yet-unexpired state-law redemption period indefinitely, thereby preventing the period from lapsing and (in effect) keeping pawned assets in the estate. See, e.g., Cash Am. Pawn, L.P. v. Murph, 209 B.R. 419, 423 (E.D. Tex. 1997) (describing the “minority position”). We reject that view for two reasons. First, it ignores ’ 11 U.S.C. § 108(b)’s specific tolling provision—which, as explained above, expressly extends a debtor’s state-law grace period, but only temporarily, for a finite term of 60 days. See supra at 1306. Reading the automatic-stay provision to effect an open-ended extension of a state-law redemption period not only would impermissibly allow the “general” Section 362(a) to control the more “specific” Section 108(b), contra, e.g., Bloate v. United States, 569 U.S. 196, 207, 130 S.Ct. 1345, 176 L.Ed.2d 54 (2010), but also (and worse) would render Section 108(b) entirely superfluous, contra, e.g., Corley v. United States, 556 U.S. 303, 314, 129 S.Ct. 1558, 173 L.Ed.2d 443 (2009). The far better understanding, we think, is that “Section 108(b) and section 362(a) are mutually exclusive; anything temporarily stayed under the specific language of section 108(b) is not indefinitely stayed by the more general language of section 362(a).” In re Maanum, 828 F.2d 459, 460 (8th Cir. 1987); see generally 3 Collier, supra, ¶ 362.03 (“[T]he majority view is that the automatic stay does not toll the running of redemption and reinstatement periods if the sale becomes effective without further action by any entity at the end of such period, and that relief for the debtor is to be found in the automatic 60-day extension of section 108(b).”). Second, and separately, any “freezing” argument founded on the automatic stay misunderstands Section 362(a)’s particular language, which specifically targets the affirmative conduct of creditors. Again, the automatic-stay provision applies to prevent “entities” from (for instance) “commene[ing]” actions, “issufing]” process, “enforcing]” judgments, and “perfecting]” liens. 11 U.S.C. § 362(a). While Section 362(a)’s text undoubtedly prevents creditors from taking steps to actively pry assets out of a debtor’s estate, it does not separately prevent those assets from evaporating -on their own—as here, “automatically”—pursuant to the ordinary operation of state law. See, e.g., In re Canney, 284 F.3d 362, 372-73 (2d Cir. 2002) (“The automatic stay prevents only certain affirmative acts taken by a creditor, and the running of time is not one of those acts.”); Johnson v. First Nat’l Bank of Montevideo, 719 F.2d 270, 276 (8th Cir. 1983) (observing that Section 362(a)’s language demonstrates that “Congress intended ... to prohibit only certain types of affirmative actions” (emphasis in original)).[8] But enough of Section 362(a), which isn’t the focus of Wilber’s argument. Rather, as his “freezing” mechanism, Wil-ber points to 11 U.S.C. § 541, which he says—with emphasis—“states that the property of the estate is created as of the commencement of the case.” Br. of Appel-lee at 4. That’s certainly true as far as it goes; under Section 541(a), “[t]he commencement of a case”—ie., the filing of a. petition—“creates an estate,” which includes, among other things, “all legal or equitable interests in property as of the commencement of the case.” 11 U.S.C. § 541(a)(1). But Section 541 neither clearly says nor unambiguously implies, see BFP, 511 U.S. at 544-45, 114 S.Ct. 1757, that a bankruptcy estate, once created, necessarily remains static. The textual indicators, in fact, point in the opposite direction, and suggest that an estate is not necessarily “frozen in time,” but rather can, in certain circumstances, expand or contract in accordance with the operation of underlying state-law property rules. Cf., e.g., 11 U.S.C. §§ 541(a)(6)—(7), 541(b)(8) (specifying instances in which property may be added to or excluded from the bankruptcy estate based on post-petition events).[9] Properly understood, the Bankruptcy Code takes an estate’s constituent property interests as it finds them. If an asset is by its state-law nature static, then it remains so in the bankruptcy estate. If, by contrast—as is often the case—state law imbues an estate asset with a sort of internal dynamism, then that characteristic will follow the asset into the estate. Such dynamism will often (and perhaps typically) increase an estate asset’s value—take, for example, the post-petition interest that accumulates on a debtor’s deposit account, which, pursuant to the traditional state-law “interest follows principal” rule, presumably inures to the account’s (and thus the estate’s) bottom line. Cf. Phillips v. Washington Legal Found., 524 U.S. 156, 165, 118 S.Ct. 1925, 141 L.Ed.2d 174 (1998) (“The rule that ‘interest follows principal’ has been established under English common law since at least the mid-1700’s.”). But increase will not always be the result—sometimes the dynamism will reduce (or even eliminate) an asset’s value. Think, for instance, about a debtor whose bankruptcy estate includes an option contract. If the debtor fails to exercise the option in accordance with state law, then the right to buy disappears. This case reflects the same basic phenomenon. Under Georgia’s pawn statute, following his loan’s maturity date, Wilber had a conditional right to possess the Charger as well as a right to redeem it during the statutory period. But after the expiration of the prescribed period, Wilber had no rights in the car, posses-sory or otherwise. Rather, his rights had been “automatically ... extinguished” and “automatically forfeited to [TitleMax].” Ga. Code Ann. § 44-14-403(b)(3). Finding no clear indication that Congress intended to do so, see BFP, 511 U.S. at 544-45, 114 S.Ct. 1757, we must reject Wilber’s contention that 11 U.S.C. § 541 “froze[ ]” his bankruptcy estate’s assets at the time he filed his initial petition, and thereby thwarted the normal operation of the Georgia pawn statute’s automatic-ex-tinguishment provision. Accordingly, we hold that when Wilber’s redemption period lapsed on December 29, 2015, his rights in the Charger were immediately forfeited, extinguished, and vested in TitleMax.[10] C That’s the end of the road for us. Because we hold that the car ceased to be property of the bankruptcy estate upon the expiration of the redemption period, it follows that 11 U.S.C. § 1322(b)(2)—on which the district court founded its ultimate conclusion, and on which the dissent predicates its analysis, see Dissenting Op. at 1323-25 has no field of application to this case. Under that provision, a Chapter 13 plan can “modify the rights of holders of secured claims” on property in the estate. 11 U.S.C. § 1322(b)(2). It is axiomatic, though, that a plan can “modify .., rights” arising under a “claim” only if the claim exists at the time the plan would purport to modify the rights associated with it—namely, at confirmation. Here, by the time the bankruptcy court confirmed Wilber’s Chapter 13 plan on February 9, 2016, TitleMax didn’t have a mere “claim”—it had (by operation of Georgia law) a 2006 Dodge Charger. ⅜ ⅝ ⅜ A brief coda: Having endeavored along the way to meet our dissenting colleague’s specific objections, we must respond briefly to his more sweeping charge that we have “disregarded]” or cavalierly “passe[d] by” settled procedural rules in a conscious effort to “move to the merits”— only, he says, to adopt a rule that “undermines long-established principles of bankruptcy law and the,Code itself, and runs contrary to the purpose of Chapter 13 bankruptcy.” Dissenting Op. at 1317, 1325. With the utmost respect, none of that is true. The former intimation—that we’ve somehow bent normal procedures in a headlong rush to parse the U.S. Bankruptcy Code—seems to us to refute itself. That’s not how courts should operate, and it’s not how we operate—and, let’s just say, the temptation to cut corners is not particularly strong (which is to say nonexistent) when the reward for doing so is an exhaustive assessment of Chapter 13, Georgia’s “pawn” statute, and those laws’ combined import for the fate of a 2006 Dodge Charger, (If anything, the incentives would seem to run in the other direction, but we digress.) Here as always, we’re just doing our best to call ’em like we see ’em. And needless to say, we find no particular joy in concluding that a pawnbroker now owns the car that Mr. Wilber, once drove. For better or worse, that’s simply the result that, on our reading, the law requires. As for the dissent’s suggestion that our interpretation of the Bankruptcy Code is in any way extraordinary, suffice it to say that the record demonstrates otherwise. Indeed, quite the contrary, the rule that we adopt has been embraced by a number—and seemingly a clear majority—of bankruptcy courts deciding materially identical cases. See Hon. W. Homer Drake, Jr., Hon. Paul W. Bonapfel & Adam M. Goodman, Chapter 13 Practice and Procedure § 14.16. (2017) (cataloguing numerous decisions holding that “forfeiture occurs if the debtor does not redeem the vehicle within the redemption period, as extended by Code § 108(b),” and that “if the debtor does not timely redeem, the property is not property of the estate and a plan cannot modify the pawnbroker’s claim”).[11] So while this is admittedly a tough case, with respectable arguments on both sides—and while we appreciate and admire the vigor with which the dissent has pressed its position—today’s decision is in the heartland of mainstream bankruptcy law, practice, and precedent. iy For the foregoing reasons, we REVERSE the district court’s judgment and REMAND for proceedings consistent with this opinion. . Wilber and Jonathan Northington were debtors in two virtually identical bankruptcy cases. The district court combined the cases on appeal from the bankruptcy court. North-ington, though, failed to comply with his Chapter 13 plan, and the bankruptcy court therefore dismissed his proceeding. That dismissal moots TitleMax’s appeal against Northington. See Neidich v. Salas, 783 F.3d 1215, 1216 (11th Cir. 2015) (“[T]he dismissal of a Chapter 13 case moots an appeal arising from the debtor's bankruptcy proceedings.”). . Although a pawnbroker has the right to take possession of pledged property during the redemption period, see id. § 44-12-131(a)(3), TitleMax didn't do so here. . That being the case, the entirety of Part I of the dissenting opinion—urging that "[wjhether a party made an objection is a factual finding subject to clear error review” and that the bankruptcy court here “specifically found” that TitleMax failed to formally “object” to confirmation—is beside the point. Dissenting Op. at 1317-19. . Accordingly, to the extent that TitleMax’s lawyers have contended from time to time that, practically speaking, their motion for relief from the stay was tantamount to a more formal “Objection,” see Dissenting Op. at 1318 n.2, 1320-21, they have good company in Wilber’s own counsel, .Although Boyd isn’t quite on point—there, the debtor’s state-law redemption period expired before he filed his Chapter 13 petition, and, accordingly, the disputed properly "was never part of [the] bankruptcy estate,” 11 F.3d at 60—its logic nonetheless applies. As explained in detail below, TitleMax contends that by the time Wilber’s plan was confirmed, the Charger had dropped out of the estate by the “automatic[ ]” operation of Georgia’s pawn statute. Accordingly, at the pertinent moment of confirmation—by which point Tit-leMax had clearly asserted its position in.its motion for relief from the stay—the creditors in Boyd and this case were identically situated. . Far, then, from the collateral "post-confirmation challenge” that the dissent posits, see Dissenting Op. at 1319, 1321, TitleMax has prosecuted a garden-variety direct appeal from a final order denying its requested relief. The dissent’s reliance on United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 130 S.Ct 1367, 176 L.Ed.2d 158 (2010) (disallowing a years-after-the-fact collateral attack on a confirmed plan under Rule 60), and Hope v. Acorn Financial, Inc., 731 F.3d 1189 (11th Cir. 2013) (disallowing a stand-alone "post-confirmation avoidance action”), is thus misplaced. . In this respect, Georgia’s pawn statute seems to operate pretty much the same way that all state pawn laws operate—and, so far as we can tell, pretty much the same way that pawn laws have always been understood to operate. See, e.g., Ala. Code § 5-19A-6 ("Pledged goods not redeemed within 30 days following the originally fixed maturity date shall be forfeited to the pawnbroker and absolute right, title, and interest in and to the goods shall vest in the pawnbroker.”); Fla. Stat. Ann. § 539.001(10) ("Pledged goods not redeemed within the 30-day period following the maturity date of a pawn are automatically forfeited to the pawnbroker; absolute right, title, and interest in and to the goods shall vest in and shall be deemed conveyed to the pawnbroker by operation of law; and no further notice is necessary.”); 47 C.J.S, Interest & Usury § 577 (”[I]n a typical pawn, a debtor deposits goods with the pawnbroker and receives money in return, and if the customer does not ‘redeem’ the pawn within a specified time, the power to sell the goods deposited automatically passes to the pawnbroker....”); 2 W. Blackstone, Commentaries *396 (observing that "goods pledged or pawned," like other property interests giving rise to "qualified” rights, "may be redeemed, or else forfeited”). . From the fact that Section 362(a) did not of its own force prevent Wilber’s redemption period from expiring—and thereby lock the Charger into Wilber’s estate—it does not necessarily follow that TitleMax erred in seeking relief from the automatic stay before taking steps to possess the car. The lesson of In re Young, already discussed, is that a pawnbroker in TitleMax's position is better off safe (asking for leave) than sorry (bulling ahead without court permission). See supra at 1307. . The dissent criticizes our citation to 11 U.S.C. §§ 541(a)(6)—(7) and 541(b)(8), but ultimately does not fundamentally dispute the limited (but key) proposition for which we cite them—namely, that bankruptcy estates are not necessarily set in stone, but rather can and do expand and contract based on post-petition events. See Dissenting Op. at 1324. As to the dissent’s "expressio unius"—based suggestion, see id., that Section 541(b)(8) implicitly (and "permanently") includes in a debt- or’s estate unredeemed property in a title-pawn transaction like the one here—in which the debtor retains physical possession—by specifically excluding from the estate unredeemed property in an ordinary pawn transaction—in which the creditor takes possession—we can only say that we think that it stretches the negative-implication canon too far. Cf. Hon. Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012) (noting that ”[v]irtually all the authorities who discuss the negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context”). That Congress decided as a matter of federal law to exclude several specific asset types from a debtor's estate in no way convincingly implies that Congress thereby meant to forestall the ordinary operation of state-law rules that define the constituent property rights that comprise the estate. . The dissent expresses a concern that our decision creates "a bizarre incentive for Chapter 13 litigants” in that, the dissent speculates, "Georgia debtors in a title pawn situation will be in a rush to confirm their Chapter 13 plans” before the statutory grace period lapses—thereby preventing automatic forfeiture under Georgia's pawn law—"while Georgia title pawn lenders will be incentivized to deliberately delay confirmation until after the redemption period expires.” Dissenting Op. at 1324-25. But of course there are plenty of policy-based arguments to go around. The dissent’s view, for instance—in which physical possession of the vehicle malees all the difference, see id., would incentivize pawnbrokers to repossess vehicles immediately upon default, even during the pendency of the redemption period, which Georgia law clearly permits. See Ga. Code Ann. § 44-12-131(a)(3). That, needless to say, would leave downtrodden debtors even worse off, and almost certainly less able to claw their way back to solvency. All of which, we think, confirms the imprudence of interpreting statutes by reference to the goodness or badness of particular consequences or outcomes. . See also, e.g., In re Holt, No. 16-12150, 2017 WL 892333, at *2 (Bankr. N.D. Ga. 2017) (Drake, J.) (holding that "as of the expiration of the redemption period, the [d]ebtor no longer had any interest in the [v]ehicle under Georgia law, and the [v]ehicle ceased to be properly of the estate"); In re Stanfield, No. 15-50612, 2016 WL 669472, at *3 (Bankr. S.D. Ga. 2016) (holding that when the debtor failed to redeem in accordance with state law, "any legal or equitable interest that [he] possessed was extinguished, the [vehicle was no longer property of the estate, and the automatic stay ceased to apply”); In re Jones, 544 B.R. 692, 701 (Bankr. M.D. Ala. 2016) (holding that becáuse the debtor failed to redeem in accordance with state law, "she cannot now redeem her collateral under applicable law, nor modify [the creditor's] contract rights in her Chapter 13 plan"); Cash Am. Pawn, L.P. v. Murph, 209 B.R. 419, 423 (E.D. Tex. 1997) (holding that “when the [d]ebtors failed to exercise the right of redemption within the 60 day extension provided by § 108(b), they no longer had any legal or equitable interest in the collateral and it ceased to be part of the bankruptcy estate”); In re Jackson, 133 B.R. 541, 546-47 (Bankr. W.D. Okla. 1991) (holding that “[s]ince debtors failed to redeem the collateral within [the extended grace] period, they no longer have a property interest in the collateral, and the debt ... may not be administered or otherwise dealt with through debtors’ Chapter 13 plan”); In re Hand, 52 B.R. 65, 66 (Bankr. M.D. Fla. 1985) (holding that “due to the debtors' failure to redeem within the 60 days, the right to redeem was terminated and the debtors' interest in the property was permanently extinguished” and that "the right is no longer part of the estate”); cf. also, e.g., In re Oglesby, No. 01-4072, 2001 WL 34047880, at *4 (holding that “when [d]ebtors failed to exercise their right of redemption within the sixty-day extension provided by § 108(b), any legal or equitable interest they possessed in the vehicle ceased to be part of their bankruptcy estate”); In re Dunlap, 158 B.R. 724, 728 (M.D. Tenn. 1993) (holding that "[o]nce redemption is no longer possible, the debtor loses any legal or equitable interest -in a pawned good, and thus this good cannot be considered part of the bankruptcy estate,” and the "debtor may not seek to cure or modify the pawn contract under § 1322, because this remedy applies only to goods in which the estate retains an interest”).