[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-11854

_____

D.C. Docket No. 1:13-cr-00437-TCB-ECS-1


UNITED STATES OF AMERICA

Plaintiff - Appellee,


versus

ANNAMALAI ANNAMALAI,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(September 24, 2019)


Before WILSON and JORDAN, Circuit Judges, and MOORE,* District Judge.

---

* The Honorable William T. Moore, Jr., United States District Judge for the Southern District of Georgia, sitting by designation.

JORDAN, Circuit Judge:

Annamalai Annamalai appeals his convictions and 327-month sentence for numerous offenses related to his operation of a Hindu temple in Georgia. After reviewing the record, and with the benefit of oral argument, we reverse his convictions for bankruptcy fraud, conspiracy to commit bankruptcy fraud, money laundering (which were based on the underlying specified unlawful activity of bankruptcy fraud), and conspiracy to harbor a fugitive. We also conclude that the government established by a preponderance of the evidence that the loss resulting from Mr. Annamalai's bank fraud scheme was just over $100,000, but did not prove that it exceeded $400,000. We affirm in all other respects and remand for resentencing.

## I

Mr. Annamalai is a self-proclaimed Hindu priest. In 2005, he opened the Hindu Temple and Community Center of Georgia, Inc. in an office building in Norcross, Georgia. The Hindu Temple generated income in part by charging fees for religious and spiritual products and services, including religious ceremonies and horoscopes. *See generally* Laurence R. Iannaccone & Feler Bose, *Funding the Faiths: Toward a Theory of Religious Finance*, in The Oxford Handbook of the Economics of Religion 9 (2010) ("[E]ven in the United States, where Hindu temples

2

are more congregationally oriented, fee-for-service financing remains the norm. Visit an[y] Hindu temple or website and you will almost always encounter an explicit menu of price and products.").

The Hindu Temple advertised its services online and in magazines (including one that Mr. Annamalai published) that were distributed in Indian grocery stores and other temples. In typical transactions, followers called the advertised phone number for the Hindu Temple and spoke with Mr. Annamalai or one of the priests he employed. Followers who agreed to purchase a service (like a horoscope reading or prayers) would then provide a credit card number to complete the transaction.

## A

The evidence at trial showed that Mr. Annamalai used the Hindu Temple as part of a criminal scheme to defraud his followers and commit bank fraud. Mr. Annamalai used the fraud proceeds to fund a lavish lifestyle, including multiple homes and expensive cars.

For example, Mr. Annamalai charged unauthorized amounts—for services not requested or provided—on his followers' credit cards. If the followers complained about the unauthorized charges, he would claim that the charges fell under the Hindu Temple's "no refund" policy. If the followers then disputed the charges with their banks, he would submit false documents with the followers' signatures—which he had obtained by sending magazines to their homes through certified mail—to the

3

banks.  He would tell the banks that the signatures were proof that the followers had ordered the disputed services.

Sometimes, Mr. Annamalai would publish detailed stories of the followers' confidential personal struggles in his magazine.  He would also create altered audio recordings of conversations with the followers and submit them to law enforcement to justify the disputed charges.

In August of 2009, the Hindu Temple filed for Chapter 11 bankruptcy.  On November 4, 2009, the bankruptcy court appointed a trustee who became the administrator of the Hindu Temple's bankruptcy estate.  Following his appointment, the trustee quickly closed the Hindu Temple, shut its doors, and did not conduct any more business on its behalf.

A few days after the trustee's appointment, Mr. Annamalai caused the incorporation and registration of a new temple called the Shiva Vishnu Temple of Georgia, Inc.   Mr. Annamalai had previously used that name in magazine advertisements and other documents as an alternative name for the Hindu Temple.

Like the Hindu Temple, the Shiva Vishnu Temple provided religious and spiritual products and services for a fee.  A number of followers paid the Shiva Vishnu Temple for religious and spiritual services it provided to them after the Hindu Temple filed for bankruptcy and was shut down by the trustee.  These payments formed the basis for the bankruptcy fraud charges against Mr. Annamalai.

4

**B**

In 2013, a grand jury in the Northern District of Georgia returned an indictment against Mr. Annamalai and others. The government subsequently obtained two superseding indictments. The second superseding indictment charged Mr. Annamalai with 34 criminal offenses: conspiracy to commit bank fraud in violation of 18 U.S.C. §§ 1349 and 1344 (Count 1); bank fraud in violation of 18 U.S.C. §§ 1344 and 2 (Counts 2–8); filing a false federal income tax return in violation of 26 U.S.C. § 7206(1) (Count 9); conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. §§ 371 and 152(1) (Count 10); bankruptcy fraud in violation of 18 U.S.C. §§ 152(1) and 2 (Counts 11–20); money laundering in violation of 18 U.S.C. §§ 1956(a)(1)(B)(i) and 2 (Counts 21–30); making a false statement in writing in violation of 18 U.S.C. §§ 1001(a)(3) and 2 (Count 31); obstruction of justice in violation of 18 U.S.C. §§ 1503 and 2 (Count 32); making false statements under oath in a bankruptcy proceeding in violation of 18 U.S.C. §§ 152(2) and 2 (Count 33); and conspiracy to harbor a fugitive in violation of 18 U.S.C. §§ 1071 and 371 (Count 34).

Mr. Annamalai sought to dismiss several of the charges, and/or to sever some of the counts, but the district court denied his motions and the case proceeded to trial. After an 11-day trial, and four hours of deliberations, the jury convicted Mr. Annamalai of all 34 charges.

At sentencing, the district court determined that Mr. Annamalai had a total offense level of 39 (based in part on a loss amount of over $400,000 for the bank fraud offenses) and a criminal history category of I, which under the 2013 Sentencing Guidelines produced an advisory recommended imprisonment range of 262 to 327 months.  The district court sentenced Mr. Annamalai to 327 months in prison, to be followed by five years of supervised release.  It also ordered him to pay restitution in the amount of $550,527.92.

## II

Mr. Annamalai challenges the joinder of the 34 offenses and the district court's denial of his motion to sever several charges that he asserts were unrelated. "We undertake a two-step analysis to determine whether separate charges were properly tried at the same time." *United States v. Hersh*, 297 F.3d 1233, 1241 (11th Cir. 2002).  First, we review *de novo* whether the charges were properly joined under Federal Rule of Criminal Procedure 8(a).  *Id.*  Second, we review the district court's denial of the defendant's motion to sever for abuse of discretion.  *Id.*

Rule 8(a) permits an indictment to charge a defendant with multiple offenses when they "are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." We construe Rule 8(a) "broadly in favor of initial joinder" so that charges that are similar may be tried together "even if [the] offenses do not arise at the same time or

6

out of the same series of acts or transactions." *Hersh*, 297 F.3d at 1241. We reverse only if improper joinder "affect[ed] substantial rights" and "result[ed] in actual prejudice because it had substantial and injurious effect or influence in determining the jury's verdict." *United States v. Zitron*, 810 F.3d 1253, 1257 (11th Cir. 2016) (quotations omitted).

Separate charges in complex cases are properly joined as long as they arise out of the same underlying conduct. For example, in *United States v. Dominguez*, 226 F.3d 1235, 1237 (11th Cir. 2000), we refused to reverse the joinder of 28 counts—conspiracy to possess cocaine with intent to distribute, conspiracy to commit money laundering, money laundering, use of a telephone facility in commission of a felony, and mortgage fraud. Although the charges were seemingly unrelated, the government theorized and later proved at trial that the defendant "submitted fraudulent income tax returns when applying for mortgage loans in order to conceal the fact that his income had been derived from drug activity." *Id.* at 1239.

Given *Dominguez*, Mr. Annamalai's improper joinder argument fails. We determine whether joinder is proper by looking at "the allegations stated on the face of the indictment," *id.* at 1238 (quoting *United States v. Weaver*, 905 F.2d 1466, 1476 (11th Cir. 1990)), and here the grand jury charged that Mr. Annamalai used the Hindu Temple—which later filed for bankruptcy—to carry out a fraudulent scheme and then committed a number of offenses related to that scheme. The indictment

7

alleged that Mr. Annamalai defrauded followers of the Hindu Temple, misled the financial institutions that charged those followers, moved the fraud proceeds (proceeds which he failed to report on his income tax return) to a foreign bank account, improperly concealed property belonging to the Hindu Temple's bankruptcy estate, committed money laundering with the proceeds of that bankruptcy fraud, and committed a number of illegal acts related to the criminal investigation into his fraudulent activities (submitting a false document to the IRS, obstructing justice, providing false statements under oath, and conspiring to conceal a fugitive). All of these claims arose out of and were connected to the same general fraudulent scheme. Where, as here, there is an "explicit connection between the groups of charges," we need not look outside "the four corners of the indictment." *Id.*

Under Rule 14(a), "[i]f the joinder of offenses or defendants in an indictment . . . appears to prejudice a defendant . . . the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." Fed. R. Crim. P. 14(a). "The decision whether to grant a severance lies within the district court's sound and substantial discretion." *United States v. Mosquera*, 886 F.3d 1032, 1041 (11th Cir. 2018). We reverse only when the defendant demonstrates "a clear abuse of discretion resulting in compelling prejudice against which the district court could afford no protection." *Id.* (quoting *United States v. Ramirez*, 426 F.3d

1344, 1352 (11th Cir. 2005)).  Compelling prejudice occurs when, "under all the circumstances of a particular case," it is apparent that the average juror could not follow the "court's limiting instruction and appraise the independent evidence against a defendant solely on that defendant's own acts, statements, and conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." *United States v. Walser*, 3 F.3d 380, 386–87 (11th Cir. 1993).

Mr. Annamalai argues that he meets this demanding standard because the jury convicted him of several charges despite insufficient evidence, convicted him of every single offense charged, and returned its decision after only four hours.  The jury's quick deliberation and straight-ticket conviction on all charges give us some pause, but we presume that juries will follow the instructions given by the district court. *See Mosquera*, 886 F.3d at 1042 (citing *Ramirez*, 426 F.3d at 1352).  Although complex charges make for complicated trials, the intricacy of a case alone does not require severance.  That is why we have "declined to find that severance was required in some complex, multi-defendant cases." *United States v. Lopez*, 649 F.3d 1222, 1235 (11th Cir. 2011) (citing examples).  Absent other indications of prejudice, "the complexity of the case and the speed of deliberation alone [do] not constitute prejudice." *United States v. Hernandez*, 921 F.2d 1569, 1580 (11th Cir. 1991). *See also id.* (noting that "relatively short jury deliberations are an ambiguous indicator" because "[r]ather than indicating haste, it could also indicate strong

evidence."). Here, Mr. Annamalai has not shown an abuse of discretion or compelling prejudice, and to the extent that his severance argument is premised on the lack of evidence on certain charges, we address that matter below and set aside some of his convictions.

## III

Mr. Annamalai contends that his prosecution, conviction, and sentencing violated his constitutional rights to due process, equal protection, and freedom of religion. Exercising plenary review, *see, e.g., Agan v. Vaughn*, 119 F.3d 1538, 1541 (11th Cir. 1997) (applying *de novo* review to First Amendment challenge to conviction), we reject these contentions.[1]

The First Amendment prohibits a criminal charge of fraud from being based on "the truth or verity of [a person's] religious doctrines or beliefs." *United States v. Ballard*, 322 U.S. 78, 86 (1944). But the government's case here was not an impermissible attack on the Hindu religion or on the truth or verity of Mr. Annamalai's beliefs. Rather, the government prosecuted Mr. Annamalai for a scheme in which he abused his position as a Hindu priest by, among other things, causing his followers' credit cards to be charged in excess of agreed amounts and without authorization, and submitting false documents to financial institutions to

---

[1] Mr. Annamalai does not develop the equal protection argument in his brief, so we do not address it.

10

substantiate the unauthorized charges. *See* D.E. 86 at 2–5. The government's description of Mr. Annamalai and his temple as "a scam" was a fair comment on the evidence—given the testimony presented at trial about the fraud perpetrated on followers who sought and paid for spiritual help—and did not constitute an improper hostility towards Hinduism. *See Cantwell v. Connecticut*, 310 U.S. 296, 306 (1940) (noting that "penal laws are available to punish" those who, "under the cloak of religion, . . . commit frauds upon the public"); *Church of Scientology Flag Service Org., Inc. v. City of Clearwater*, 2 F.3d 1514, 1544 (11th Cir. 1993) (explaining that "the state does indeed have a compelling interest in protecting church members from affirmative, material misrepresentations designed to part them from their money"); *United States v. Rasheed*, 663 F.2d 843, 847 (9th Cir. 1981) ("The First Amendment does not protect fraudulent activity performed in the name of religion."). *See also Ballard*, 322 U.S. at 95 (Jackson, J., dissenting) ("I do not doubt that religious leaders may be convicted of fraud for making false representations on matters other than faith or experience, as for example if one represents that funds are being used to construct a church when they in fact are being used for personal purposes.").

We acknowledge that some of the government's comments during closing argument went too far. For example, the government twice referred to the individuals who served as priests at the Hindu Temple as "so-called priests." D.E. 390 at 2078, 2085. Although there was evidence that some of those priests were

11

former salesmen for Mr. Annamalai's business in India and had no religious training, *see* D.E. 384 at 813–15, generally it is not for the government to pass on religious qualifications. *Cf. Gonzalez v. Roman Catholic Archbishop of Manila*, 280 U.S. 1, 16 (1929) (explaining that "it is the function of the church authorities to determine what essential qualifications of a chaplain are and whether [a] candidate possesses them," and that such determinations are conclusive on courts). But Mr. Annamalai did not object to these comments when they were made, and on this record there is no plain error warranting reversal. Assuming that there was error, and that the error was plain, the error did not affect Mr. Annamalai's substantial rights. *See United States v. Olano*, 507 U.S. 725, 732–37 (1993) (articulating plain error standard); *United States v. Young*, 470 U.S. 1, 14–20 (1985) (applying plain error standard to government's improper remarks during rebuttal closing argument).

We also take Mr. Annamalai's point that the government exaggerated at sentencing by saying that "every dollar that was deposited into the [Hindu Temple] was in fact a fraud." D.E. 467 at 93. Indeed, some of the followers who testified at trial acknowledged that certain services they paid for—such as horoscope readings and prayers—were performed as requested and promised. *See* D.E. 381 at 103, 113; D.E. 382 at 212. *Cf. Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1298 (11th Cir. 2007) ("Simply put, judges and juries must not inquire into the validity of a religious doctrine, and the task of courts is to examine whether a plaintiff's beliefs are, 'in his

12

own scheme of things, religious.'") (citation omitted).   But the district court ultimately did not use all of the Hindu Temple's revenue as a proxy for loss, so the government's "oratorical exaggeration," *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1149 (8th Cir. 1984), did not prejudice Mr. Annamalai.

**III**

Count 10 charged Mr. Annamalai with conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371.  Counts 11–20 charged him with substantive bankruptcy fraud in violation of 18 U.S.C. § 152(1), which prohibits knowingly and fraudulently concealing from a Chapter 11 bankruptcy trustee "any property belonging to the estate of a debtor."

All of the substantive bankruptcy fraud charges were based on funds that the Shiva Vishnu Temple acquired or received *after* the Hindu Temple filed for bankruptcy in August of 2009 and *after* the trustee shut it down in early November of 2009.  Counts 11–14 and 16–20 concerned credit card receivables for transactions spanning from November 25, 2009, to October 25, 2010.  An illustrative example is Count 20, which was based on credit card receivables of $2,428.42 that the Shiva Vishnu Temple received through American Express on October 25, 2010.  Count 15 was different; it concerned a donation check for $3,000 made out to the Hindu Temple in January of 2010 and deposited into the Shiva Vishnu Temple bank account.

13

Mr. Annamalai argues that the government failed to introduce sufficient evidence to support his convictions on Counts 10–20. *See* Appellant's Br. at 38. The district court acknowledged that the matter was "close," D.E. 389 at 1792, but denied the Rule 29 motion for judgment of acquittal. *See* D.E. 390 at 2071–72; D.E. 256 at 3–4.

Exercising *de novo* review, and viewing the evidence "in the light most favorable to the government," *United States v. Robertson*, 493 F.3d 1322, 1329 (11th Cir. 2007), we agree with Mr. Annamalai that the new income generated by the Shiva Vishnu Temple, for post-bankruptcy religious or spiritual services provided to and paid for by followers, did not constitute property of the bankruptcy estate of the Hindu Temple. We also agree with him that the post-petition donation check made out to the Hindu Temple did not constitute property of the estate. And because the conspiracy charge was based only on the conduct set out in the substantive bankruptcy fraud counts, we reverse the conspiracy conviction as well.

### A

We begin by summarizing the evidence presented by the government on the bankruptcy fraud charges.

Immediately following his appointment on November 4, 2009, the trustee closed the Hindu Temple, shut its doors, and did not conduct any further business on its behalf. *See* D.E. 386 at 1182, 1185–86, 1201–03, 1206–07. The trustee

acknowledged at trial that Mr. Annamalai—who was not the organizational debtor—was permitted to open a new temple after the Hindu Temple filed for bankruptcy. *See id.* at 1203–06, 1211–12. So did the IRS investigator who testified for the government. *See id.* at 1144.

Less than a week after the trustee was appointed, Mr. Annamalai incorporated and registered a new entity called the Shiva Vishnu Temple. The physical address for the Shiva Vishnu Temple was a different location in Norcross, Georgia—a house owned by Mr. Annamalai—but the mailing address and the e-mail address apparently remained the same. *See id.* at 1095–96, 1152. After the Shiva Vishnu Temple was registered with Georgia's secretary of state, it unsuccessfully sought to transfer a merchant account that the Hindu Temple had with Global Pay/Power Pay. *See id.* at 1105–06.

In magazines distributed after the Hindu Temple filed for bankruptcy, advertisements stated that the Shiva Vishnu Temple was "also known as the Hindu Temple of Georgia" and included Mr. Annamalai in photographs. *See id.* at 1102–04. According to the IRS investigator, the Hindu Temple and the Shiva Vishnu Temple were "the same business." *Id.* at 1104.

On November 12, 2009, three days following its incorporation, the Shiva Vishnu Temple opened a new bank account at Bank of America, with Mr. Annamalai listed as one of the authorized signers. *See id.* at 1109. After this account was

opened, the merchant accounts that the Hindu Temple had with American Express and with Elavon were changed to the name of the Shiva Vishnu Temple and the Bank of America account replaced the bank account previously on file. This ensured that any future credit card receivables from these merchant accounts would be deposited in the Bank of America account. *See id.* at 1110–13, 1126–27, 1143–44. A week or so later, on November 20, 2009, the Shiva Vishnu Temple opened a new merchant account with Global Pay. *See id.* at 1120.

The trustee maintained at trial that the bankruptcy estate of the Hindu Temple included its merchant accounts, as well as all post-bankruptcy receivables that ran through those accounts (even if they were routed to the new bank account of the Shiva Vishnu Temple). *See id.* at 1185–87, 1219–20. His explanation for this legal conclusion was that "[a]ssets coming into the bankruptcy entity become property of the estate." *Id.* at 1188. The trustee testified that Mr. Annamalai had to obtain his permission to use the merchant accounts belonging to the Hindu Temple, and that Mr. Annamalai did not do so when he changed the American Express and Elavon merchant accounts from the Hindu Temple to the Shiva Vishnu Temple. *See id.* at 1220–21. The trustee asserted that if Mr. Annamalai provided services to others, the money for such services was his to keep as long as he was not "doing it under the auspices of the Hindu Temple of Georgia." *Id.* at 1205.

16

Significantly, the IRS investigator acknowledged that no funds in the merchant accounts of the Hindu Temple were moved or transferred to the Shiva Vishnu Temple. *See id.* at 1146, 1151. The receivables which formed the basis of the bankruptcy fraud charges in Counts 11–14 and 16–20 were for "new services" provided post-bankruptcy, and the receivables for those services went to the Shiva Vishnu Temple. *See id.* at 1154–55. In other words, the Shiva Vishnu Temple accepted payments for religious services it provided to followers after the Hindu Temple filed for bankruptcy. As the IRS investigator put it, it was "[n]ew money, new customers, new service, new bank account." *Id.* at 1157, 1160–61.

The trustee did not know the names of the followers who made payments on their credit cards to the Shiva Vishnu Temple. *See id.* at 1212–1213. He also did not know whether any of them believed that they were making payments to the Hindu Temple as opposed to the Shiva Vishnu Temple. *See id.* at 1213. The trustee opined that money that was due to the Hindu Temple "was diverted" to the Shiva Vishnu Temple, and if so it "may have been [the bankruptcy estate's] money," but he admitted that he did not "know that for a fact." *Id.* Indeed, when asked how he knew that someone in October of 2010 was using the name of the Hindu Temple to elicit post-bankruptcy credit card payments from followers, the trustee said he did not "know that" and could not "prove that." *Id.* at 1214.

17

In January of 2010, Kumar Chinnathambi, Mr. Annamalai's co-conspirator, deposited a $3,000 check—made out to the Hindu Temple of Georgia as a donation—into the bank account of the Shiva Vishnu Temple without the trustee's knowledge or consent. *See* D.E. 386 at 1127. The trustee testified that he never spoke to the donors and therefore did not know "what was on their minds" when they issued the check, *id.* at 1211, and the donors did not testify at trial. The government called an agent to testify about the donation check, and he described the check, noting the account in which it was deposited and who deposited it. *See id.* at 1127–28, 1172–73.

**B**

As noted earlier, 18 U.S.C. § 152(1) prohibits knowingly and fraudulently concealing from a bankruptcy trustee (and certain other persons) "any property belonging to the estate of a debtor." The elements of a § 152(1) offense in a Chapter 11 context are (1) the existence of a bankruptcy proceeding; (2) the existence of property belonging to the bankruptcy estate; and (3) the defendant's knowing and fraudulent concealment of that property from the trustee, custodian, marshal, or other officer of the court charged with custody and control of that property. *See United States v. Spurlin*, 664 F.3d 954, 960 (5th Cir. 2011); *United States v. Wagner*, 382 F.3d 598, 607 (6th Cir. 2004). With these elements in mind, we address whether the government proved that the post-petition receivables of the Shiva Vishnu Temple

18

charged in Counts 11–14 and 16–20 and the $3,000 donation check charged in Count 15 constituted property of the bankruptcy estate of the Hindu Temple.

As a general matter, "[w]hether property is part of the bankruptcy estate is a factual issue for the jury." *United States v. Dennis*, 237 F.3d 1295, 1300 (11th Cir. 2001). Here, however, the evidence was insufficient as a matter of law as to the substantive bankruptcy fraud charges in Counts 11–20 because the post-petition receivables of the Shiva Vishnu Temple and the $3,000 donation check were not the property of the bankruptcy estate of the Hindu Temple. Whatever wrongs Mr. Annamalai may have committed with respect to those receivables and the donation check did not constitute bankruptcy fraud on the evidence presented.

The Bankruptcy Code, in 11 U.S.C. § 541(a), defines what property interests comprise the bankruptcy estate. *See* 5 Collier on Bankruptcy ¶ 541.03 (16th ed. 2019). The government only relies on subsections (a)(1) and (a)(6), *see* Gov't Br. at 39–40, so we do not address subsections (a)(2)–(5) or (7).

We begin with § 541(a)(1), which provides that the bankruptcy estate consists of "all legal and equitable interests of the debtor in property *as of the commencement of the [bankruptcy] case*." 11 U.S.C. § 541(a)(1) (emphasis added). While state law generally creates and defines property interests, *see Butner v. United States*, 440 U.S. 48, 55 (1979), the bankruptcy estate "succeeds only to those interests that the debtor had in property *prior* to the commencement of the bankruptcy case." *In re FCX,*

19

*Inc.*, 853 F.2d 1149, 1153 (4th Cir. 1988) (emphasis added).  Due to this textual

temporal limitation, the bankruptcy estate under § 541(a)(1) "is determined at the

time of the initial filing of the bankruptcy petition[.]" *In re Majestic Star Casino,*

*LLC*, 716 F.3d 736, 751 (3d Cir. 2013) (quotation omitted).  This has been our

understanding for some time. *See Ford, Bacon & Davis, Inc. v. Holahan*, 311 F.2d

901, 902 (5th Cir. 1962) (addressing § 70(a) of the former Bankruptcy Act: "[T]he

determination of what property vests in the trustee is made as of th[e] date [on which

the petition is filed.]"); *Curtis v. Humphrey*, 78 F.2d 73, 74 (5th Cir. 1935) ("Any

right the trustee had became fixed as of the date the bankruptcy petition was

filed[.]").  Because the receivables charged in Counts 11–14 and 16–20 and the

donation check charged in Count 15 did not exist in August of 2009, when the Hindu

Temple filed for bankruptcy, they were not part of the estate under § 541(a)(1).

The post-bankruptcy receivables were in fact payments for "new services"

provided to followers by the Shiva Vishnu Temple *after* the Hindu Temple filed for

bankruptcy. *See* D.E. 386 at 1154–55, 57.  Those services simply were not provided

by the Hindu Temple, which did no more business after the trustee shut it down in

early November of 2009, or its estate.  Further, the trustee and the IRS investigator

testified (correctly in our view) that nothing prevented Mr. Annamalai—who was

not the debtor—from opening a new temple like the Shiva Vishnu Temple and

providing religious services to followers after the Hindu Temple filed for

20

bankruptcy. *See In re BBeautiful*, No. 2:16-bk-10799-ER, 2017 WL 932945, at *5 (Bankr. C.D. Cal. Mar. 8, 2017) (explaining that new post-bankruptcy business relationships established by the principal of the corporate debtor did not constitute property of the estate).

We recognize that the trustee opined that the post-petition receivables of the Shiva Vishnu Temple belonged to the estate. That opinion, however, amounted to an incorrect and unsupported legal conclusion. *Cf. In re Thena, Inc.*, 190 B.R. 407, 412 (D. Oregon 1995) ("Chapter 11 does not permit the estate's inclusion of property that did not exist at the time of filing, for the debtor's beneficial, equitable use. . . . Congress promulgated Chapter 11 to protect, rather than enhance, the debtor's estate.").

Take Count 20, which involved receivables processed and received by the Shiva Vishnu Temple on October 25, 2010, over 13 months after the Hindu Temple filed for bankruptcy and about 11 months after the trustee shut its doors. In its closing argument, the government told the jury that all of the funds generated by the Shiva Vishnu Temple constituted property of the bankruptcy estate of the Hindu Temple, no matter how much time passed, "because the bankruptcy was still pending." D.E. 390 at 2093. But the ongoing nature of a bankruptcy proceeding does not, by itself, dictate whether something is or is not property of the estate. If the government's theory concerning property of the estate were correct, the temporal

21

limitation set out in the text of § 541(a)(1) (i.e., "as of the commencement of the [bankruptcy] case") would be rendered illusory. We decline the invitation, express or implied, to depart from the statutory language.[2]

The bankruptcy estate also encompasses "proceeds, product, offspring, rents, or profits *of or from* property of the estate." 11 U.S.C. § 541(a)(6) (emphasis added). Contrary to the government's suggestion, there is insufficient evidence to show that the post-bankruptcy receivables fell within § 541(a)(6). The "Bankruptcy Code takes an estate's constituent property interests as it finds them," *In re Northington*, 876 F.3d 1302, 1314 (11th Cir. 2017), and the government did not prove or explain (or cite any authority to support) how the estate (and everything it comprised at the time of filing) generated these post-bankruptcy receivables. *See In re Bracewell*, 454 F.3d 1234, 1245 (11th Cir. 2006) (explaining that under § 541(a)(6) the "proceeds must be 'of or from the property of the estate'"). The merchant accounts, even assuming they were property of the estate, were used to *process* the credit card payments but not to *generate* them.

Likewise, the government made no attempt to demonstrate that the $3,000 donation check was generated by property of the bankruptcy estate under §

---

[2] In Chapter 11 cases where the debtor is an individual, the property of the estate also includes "earnings from services performed by the debtor after the commencement of the case but before the case is closed, dismissed, or converted to a case under [C]hapter 7, 12, or 13." 11 U.S.C. § 1115(a)(2). This provision is inapplicable because Mr. Annamalai was not an individual Chapter 11 debtor.

541(a)(6).  *See In re Bracewell*, 454 F.3d at 1245.  Once the bankruptcy trustee shut down the Hindu Temple, it stopped serving followers.  At no point, however, did the government attempt to connect the check to property of the Hindu Temple's bankruptcy estate.  The agent who testified about the check at trial only related who the check was made out to, the account in which it was deposited, and who deposited it.  The donors of the $3,000 check did not testify, and absent any other evidence from the government—as far as we can tell none was presented at trial—the jury could not find that the donation check was a proceed, product, offspring, rent, or profit generated from some activity performed by the estate or its property.

We again acknowledge the testimony of the trustee, who believed that "assets coming into the bankruptcy entity become property of the estate," and that, as a result, the donation check was property of the estate.  *See* D.E. 386 at 1187–88.  But that opinion is not evidence that the donation was in fact a proceed, product, offspring, rent, or profit "of or from property of the estate."  Because the post-petition check was not part of the estate, Mr. Annamalai could not be convicted of bankruptcy fraud for misappropriating it.[3]

We address two other possible theories.  At the end of the day, they also fail.

---

[3] The conduct here could have supported a state theft or embezzlement charge.  But the government used the check to charge Mr. Annamalai with the federal offense of bankruptcy fraud, and it is his conviction on that charge that we are reviewing.

23

First, we realize that in the trustee's view all of the merchant accounts of the Hindu Temple were property of the bankruptcy estate, and that Mr. Annamalai failed to obtain his permission to modify them, transfer them, or use them.  We assume without deciding that this was indeed the case, *cf. In re Thomas B. Hamilton, Inc.*, 969 F.2d 1013, 1018–21 (11th Cir. 1992) (discussing the nature of credit card merchant agreements in the context of a corporate bankruptcy), but this assumption does not save the bankruptcy fraud convictions.  The insurmountable difficulty for the government is that Counts 11–14 and 16–20 did not charge Mr. Annamalai with misappropriating the merchant accounts.  They charged him with concealing specific receivables obtained by the Shiva Vishnu Temple on certain dates after the Hindu Temple filed for bankruptcy and stopped doing business.  And, as noted earlier, the government's own evidence demonstrated that Mr. Annamalai never transferred to the Shiva Vishnu Temple any money in the merchant accounts belonging to the Hindu Temple.[4]

Second, to the extent that the government relies on the trustee's testimony that Mr. Annamalai acted improperly by calling his new temple the Shiva Vishnu Temple when that name had been an alternative name of the Hindu Temple, that reliance is

---

[4] Even if the government's argument about the merchant accounts had some factual or legal merit, it would not salvage Counts 12, 17, and 19, which involved receivables processed through a new merchant account that the Shiva Vishnu Temple opened with Global Pay after the bankruptcy of the Hindu Temple.

misplaced. Simply stated, Mr. Annamalai was not charged in Counts 11–14 and 16–20 with misappropriating the Shiva Vishnu Temple name.

## C

At trial, the IRS investigator testified that the Hindu Temple and the Shiva Vishnu Temple were the same business, and the government told the district court that it considered the Shiva Vishnu Temple to be the alter ego of the Hindu Temple. *See* D.E. 386 at 1116–17. At closing argument, the government asserted that Mr. Annamalai was "using the same business," including the "good will of the Hindu Temple," to run the Shiva Vishnu Temple. *See* D.E. 390 at 2090. He was, in other words, "continuing the business." *Id.* at 2093. On appeal the government defends the bankruptcy fraud convictions on a similar alter ego theory, *see* Gov't Br. at 40–41, but due to the way this case was tried the theory is fatally flawed.

The government seems to believe that the Hindu Temple and its bankruptcy estate were one and the same, so that any continuation of the Hindu Temple's business by the Shiva Vishnu Temple is necessarily equated with the estate and all it comprised. That belief, however, is based on a misunderstanding of bankruptcy law. A Chapter 11 estate, which is created by the filing of a bankruptcy petition, is separate and distinct from the corporate debtor, which "continues to exist as a legal entity after the filing of [the] petition, whether under [C]hapter 7 or 11[.]" 5 Collier on Bankruptcy ¶ 541.02 (16th ed. 2018). *See also Indian Harbor Ins. Co. v. Zucker*,

25

860 F.3d 373, 378 (6th Cir. 2017) ("Capitol's bankruptcy . . . created a new legal entity that is distinct from Capitol itself: the bankruptcy estate."). This misunderstanding is not necessarily fatal to the government's alter ego theory, but neither is it a good starting point.

In other bankruptcy contexts, one who seeks to pierce the corporate veil or disregard the corporate form must proceed under state law. *See, e.g., In re Icarus Holding, LLC*, 391 F.3d 1315, 1321–23 (11th Cir. 2004) (certifying to the Georgia Supreme Court the question of whether a bankruptcy trustee for a corporate debtor can assert an alter ego claim against the corporation's former principal); *In re ACME Sec., Inc.*, 484 B.R. 475, 478–95 (Bankr. N.D. Ga. 2012) (addressing the question of successor liability in a corporate bankruptcy under Georgia law). We see no reason why a different rule should apply here. The government apparently recognizes the need to satisfy state law, as it cites a case from the Georgia Supreme Court on disregarding the corporate form. *See* Gov't Br. at 40–41 (citing *Baillie Lumber Co. v. Thompson*, 612 S.E.2d 296, 298 (Ga. 2005)).

The problem, as we see it, is that the jury was not instructed on any alter ego theory of any kind. It was not, for example, told what Georgia law requires to establish that one entity (i.e., the Shiva Vishnu Temple) is the alter ego of another (i.e., the Hindu Temple or the bankruptcy estate). *See* D.E. 391 at 2150–78. So, even if we assume that an alter ego theory can be used to bring post-bankruptcy-

26

generated income earned by a separate corporate entity back into a Chapter 11 estate—an issue that apparently no court has ever decided and one which we decline to address—the assumption is of no help to the government.  In a criminal case like this one, where the government's burden is to prove guilt beyond a reasonable doubt, we cannot affirm Mr. Annamalai's bankruptcy fraud convictions on Counts 11–20 on a theory of liability not presented to the jury.  *See McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) ("[T]he Court of Appeals affirmed [the defendant's] conviction on legal and factual theories never tried before the jury. . . [F]or that reason alone . . . the judgment must be reversed."); *Jackson v. Virginia*, 443 U.S. 307, 314 (1979) ("It is axiomatic that a conviction upon a charge not made or a charge not tried constitutes a denial of due process.").  The convictions on Counts 11–20 are reversed.

## D

At trial and on appeal, the government presented a theory of the case that relied on the same acts and evidence to prove both substantive bankruptcy fraud and conspiracy to commit bankruptcy fraud.  In other words, the substantive bankruptcy fraud charges in Counts 11–20 formed the basis for the illegal agreement and the overt acts for the conspiracy to commit bankruptcy fraud charged in Count 10.  *See, e.g.,* D.E. 390 at 2093 (explaining at closing argument that "[t]he opening of this [new Shiva Vishnu bank] account" and the "diverting of the credit card receipts"

27

were the overt acts in furtherance of the alleged conspiracy); D.E. 227 at 5 (relying, in opposition to the Rule 29 motion for judgment of acquittal, on the same acts to demonstrate that there was sufficient evidence to prove both the substantive counts of bankruptcy fraud and the conspiracy to commit bankruptcy fraud); Gov't Br. at 36–38 (same).

Having held that the evidence was insufficient to sustain the convictions for the substantive bankruptcy fraud charges, we necessarily conclude that the evidence was likewise insufficient to sustain the conviction for conspiracy to commit bankruptcy fraud because the alleged illegal agreement did not involve property of the Hindu Temple's bankruptcy estate. The government did not present evidence of a separate agreement to conceal other property of the estate or any other overt acts in furtherance of such an agreement. We therefore reverse Mr. Annamalai's Count 10 conviction for conspiracy to commit bankruptcy fraud.

## IV

Mr. Annamalai challenges his convictions on Counts 21–30, which charged him with money laundering in violation of 18 U.S.C. § 1956. As relevant here, that statute prohibits certain transfers of money derived from specified unlawful activities, including bankruptcy fraud. *See* 18 U.S.C. § 1956(c)(7)(d).

Each of the money laundering charges was predicated on proceeds generated from the specified unlawful activity of bankruptcy fraud. *See* D.E. 86 at ¶ 32.

28

Because we have reversed all of Mr. Annamalai's convictions for substantive bankruptcy fraud and conspiracy to commit bankruptcy fraud due to insufficient evidence, there are no specified unlawful activities which provide a basis for the money laundering charges.  We therefore reverse all of Mr. Annamalai's money laundering convictions.

## V

Mr. Annamalai contends, as he did in the district court, *see* D.E. 389 at 1796, that there was insufficient evidence to support his conviction on Count 34 for conspiring to harbor a fugitive in violation of 18 U.S.C. §§ 1071 and 371.  We agree.

## A

To prove a conspiracy under § 371, the government must prove that there was an agreement "between two or more persons to commit a crime," that the defendant "knowingly and voluntarily joined or participated in the unlawful agreement," and that "a conspirator performed an overt act in furtherance of the unlawful agreement." *United States v. Duenas*, 891 F.3d 1330, 1334 (11th Cir. 2018).  The "fundamental characteristic of a [§ 371] conspiracy is a joint commitment to an 'endeavor which, if completed, would satisfy all of the elements of [the underlying substantive] criminal offense.'"  *Ocasio v. United States*, 136 S. Ct. 1423, 1429 (2016) (quoting *Salinas v. United States*, 522 U.S. 52, 65 (1997)).  So, in order to determine whether

the evidence was sufficient to convict Mr. Annamalai of violating § 371, we must

first consider the elements of § 1071, the object of the charged conspiracy.

> As relevant here, § 1071 makes it a federal crime to
>
> harbor[ ] or conceal[ ] any person for whose arrest a warrant or process
> has been issued under the provisions of any law of the United States, so
> as to prevent his discovery and arrest, after notice or knowledge of the
> fact that a warrant or process has been issued for the apprehension of
> such person[.]

As a number of other circuits have explained, a straightforward reading of this

statutory text establishes the following elements: (1) a federal warrant was issued

for a person's arrest; (2) the defendant knew about that warrant; (3) the defendant

harbored or concealed that person; and (4) the defendant did so with the intent to

prevent that person's arrest or discovery.  *See United States v. Stegmeier*, 701 F.3d

574, 578 (8th Cir. 2012); *United States v. Hill*, 279 F.3d 731, 737–38 (9th Cir. 2002);

*United States v. Lockhart*, 956 F.2d 1418, 1422–23 (7th Cir. 1992); *United States v.*

*Silva*, 745 F.2d 840, 848 (4th Cir. 1984).  These decisions are consistent with one of

our early § 1071 cases.  *See Blankenship v. United States*, 328 F.2d 19, 19 (5th Cir.

1964) (upholding the § 1071 conviction of a defendant who "concealed and harbored

his brother, knowing that he was a fugitive and that a felony warrant had been issued

for his arrest").  *See also United States v. Deaton*, 468 F.2d 541, 544–45 (5th Cir.

1972) (holding that transporting, finding, and securing lodging for escapees

30

constituted "harboring" under 18 U.S.C. § 1072, which prohibits the willful harboring or concealing of a federal prisoner after his escape).

Importantly, § 1071 "does not proscribe all forms of aid to a fugitive and . . . the actual harboring or concealing element requires some affirmative, physical action by the defendant." *United States v. Zabriskie*, 415 F.3d 1139, 1145 (10th Cir. 2005) (quotations omitted).  *Accord Stegmeier*, 701 F.3d at 579; *United States v. Mitchell*, 177 F.3d 236, 239 (4th Cir. 1999); *United States v. Green*, 180 F.3d 216, 220 (5th Cir. 1999); *Lockhart*, 956 F.2d at 1423; *United States v. Stacey*, 896 F.2d 75, 76–77 (5th Cir. 1990).  In the words of the Second Circuit, "harbor" and "conceal" are "active verbs, which have the fugitive as their object," and they refer to "some physical act tending to the secretion of the body of the offender." *United States v. Shapiro*, 113 F.2d 891, 892–893 (2d Cir. 1940) (discussing the predecessor to § 1071).  *See also* Black's Law Dictionary 831 (10th ed. 2014) (defining "harboring" as "[t]he act of providing lodging, shelter, or refuge to a person, esp. a criminal or illegal alien," and "harboring a fugitive" as "[t]he crime of affording lodging, shelter, refuge, or other aid to a person seeking avoid capture or punishment").

A comparison of § 1071 cases helps to explain generally what is and is not prohibited.  Cases affirming convictions include *United States v. Hayes*, 518 F.3d 989, 994 (8th Cir. 2008) (not opening the door of the place where the fugitive was

31

hiding for over an hour after agents arrived on the scene); *Lockhart*, 956 F.2d at 1423 (allowing a fugitive to live on the defendant's lot and hiding his car); *Stacey*, 896 F.2d at 76–77 (closing and locking the door of the place where a fugitive was hiding to prevent his arrest by deputy marshals who had seen him); *United States v. Arguelles*, 594 F.2d 109, 111 (5th Cir. 1979) (purchasing cars together with a fugitive, making repairs to cars in the defendant's name but with the fugitive paying for them, and living together with the fugitive and making some rent payments); and *United States v. Whitman*, 480 F.2d 1028, 1030 (6th Cir. 1973) (renting a cabin so that it could be used by a fugitive on the run). Cases reversing convictions include *United States v. Hogg*, 670 F.2d 1358, 1361–62 (4th Cir. 1982) (making a potentially misleading statement about a car that the defendant suspected was stolen by a fugitive), and *Shapiro*, 113 F.2d at 893 (making weekly payments to a fugitive: "To pay money to a fugitive so that he may shelter, feed or hide himself is not within the accepted meanings of to 'harbor or conceal' him."). Some courts draw a distinction "between paying money to a fugitive so that he may shelter, feed or hide himself, which is not harboring, and providing that shelter, food, or aid directly, which is harboring." *Hill*, 279 F.3d at 738 (internal quotations omitted). *See also United States v. Lanier*, 879 F.3d 141, 148 (5th Cir. 2018) ("provid[ing the fugitive] with a revenue stream that funded his life on the lam" does not "qualify as harboring").

32

**B**

The indictment charged Mr. Annamalai with conspiring, from November of 2013 to April of 2014, to harbor and conceal his fugitive business partner, Mr. Chinnathambi, for whom an arrest warrant had been issued. The other alleged members of the conspiracy were Parvathi Sivanadiyan (Mr. Annamalai's wife) and Mr. Chinnathambi himself. *See* D.E. 86 at ¶ 37.

According to the indictment, on November 15, 2013, Mr. Chinnathambi purchased one-way airline tickets for flights the next day from Orlando, Florida, to Chennai, India, via Chicago, Illinois, and Hong Kong. He traveled from Orlando to Chicago but did not board the flight to Hong Kong. *See id.* at ¶ 41. On November 16, 2013, Mr. Annamalai—after his own arrest and while detained—had a conversation with his wife. During this conversation, he instructed her to tell someone named "Sheshamani" (an alias for Mr. Chinnathambi) that he "should use cash and not a debit card." *Id.* at ¶ 42. Later that same day, his wife sent an e-mail to Mr. Chinnathambi instructing him "to use cash." *Id.* at ¶ 43.

Several months later, Mr. Annamalai's wife spoke to federal agents. She falsely told them that she did not have contact with Mr. Chinnathambi since her husband's arrest; that she never sent an e-mail to Mr. Chinnathambi and did not know his e-mail address; and that she did not have a telephone number for Mr. Chinnathambi. *See id.* at ¶ 44.

33

The evidence at trial, as was to be expected, tracked the allegations in the indictment. *See, e.g.,* D.E. 387 at 1403–11.  But the evidence, like the indictment, did not make out an unlawful agreement to violate § 1071.

As explained above, § 1071 requires some affirmative physical act to help harbor or conceal a person for whom a warrant has been issued.  A § 371 conspiracy to violate § 1071 therefore requires an agreement or understanding that one or more of the conspirators will commit such an act.  *See Ocasio*, 136 S. Ct. at 1429.  There was no such agreement here.

First, Mr. Annamalai's instruction to Ms. Sivanadiyan that she tell Mr. Chinnathambi to use cash and not a debit card, and her compliance with that instruction, are insufficient.  We can find no cases holding that the mere giving of advice to a fugitive, without providing some sort of material or physical assistance, constitutes harboring or concealing within the meaning of § 1071.  An agreement to provide such advice therefore is not an agreement to violate § 1071.  The government, tellingly in our view, does not cite any § 1071 cases or other authorities to support its sufficiency argument on this theory.  *Cf. Piquett v. United States*, 81 F.2d 75, 81 (7th Cir. 1936) (agreeing to alter a fugitive's "facial features and finger lines" suffices to constitute a conspiracy to harbor and conceal a fugitive).

Second, Ms. Sivanadiyan's false statements to the agents about Mr. Chinnathambi and his whereabouts also do not constitute harboring or concealing.

34

The decisions from our sister circuits, which we find persuasive, make that clear. *See Stacey*, 896 F.2d at 76–77 ("Failure to disclose a fugitive's location and giving financial assistance do not constitute harboring[.]"); *United States v. Magness*, 456 F.2d 976, 978 (9th Cir. 1972) ("[A] false statement, standing alone, . . . could not constitute the active conduct of hiding or secreting contemplated by the statute."); *United States v. Foy*, 416 F.2d 940, 941 (7th Cir. 1969) ("[W]e do not think that a failure to disclose the location of a fugitive is the type of assistance contemplated by 'harbor and conceal' as used in § 1071.").

Third, we are not persuaded by the government's reliance on the airline tickets that Mr. Chinnathambi purchased (and partially used). The government says that the tickets show that Mr. Chinnathambi sought to flee the United States. *See* Gov't Br. at 53. The jury easily could have found as much, but even so, the evidence on Count 34 was legally insufficient. For starters, the trip took place before Mr. Annamalai instructed his wife to tell "Sheshamani" to use cash. But even if the alleged conspirators had previously agreed about the trip, the flight—with tickets Mr. Chinnathambi purchased himself—did not constitute the harboring or concealing of him by Mr. Annamalai and his wife. We have not located any cases or authorities to the contrary, and the government has not pointed us to any. Congress knows when to make flight from arrest or prosecution a federal offense, *see, e.g.,* 18 U.S.C. § 1073, and it did not use the word flight in § 1071. And even

35

if we assume, contrary to cases like *Shapiro*, that providing money to a fugitive can sometimes be sufficient to convict under § 1071, there is no any evidence (direct or circumstantial) that Mr. Annamalai or his wife provided (or agreed to provide) the funds used by Mr. Chinnathambi to purchase the airline tickets.

In sum, we decline to make § 1071 "a catchall to make crimes out of actions which law-enforc[ement] agents may feel to be undesirable, but which Congress has not seen fit to prescribe." *Miller v. United States*, 230 F.2d 486, 488 (5th Cir. 1956) (discussing the scope of 18 U.S.C. § 1501). Whatever the agreement between Mr. Annamalai, his wife, and Mr. Chinnathambi, it was not an agreement to violate § 1071 by harboring or concealing the latter. The conviction on Count 34 is reversed.

## VI

We now turn to Mr. Annamalai's challenge to the district court's loss determination. In addressing his arguments, we review the interpretation of the Sentencing Guidelines *de novo* and the determination of loss for clear error. *See United States v. Corbett*, 921 F.3d 1032, 1037 (11th Cir. 2019).

## A

In a fraud case, the Sentencing Guidelines provide for an increase in the base offense level corresponding to the loss resulting from the offense. *See* U.S.S.G. § 2Bl.l(b)(1). Because "often the amount of loss caused by fraud is difficult to determine accurately," a sentencing court can use a "reasonable estimate" of the loss.

36

*See United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (citing § 2B1.1(b)(1), comment (n.3(C))).  If the defendant objects, the government must prove its loss calculation by a preponderance using "reliable and specific evidence." *Id*. (quoting *United States v. Sepulveda*, 115 F.3d 882, 890 (11th Cir. 1997)).  *See also United States v. Isaacson*, 752 F.3d 1291, 1305 (11th Cir. 2014) ("When the government seeks to apply an enhancement under the Sentencing Guidelines over a defendant's factual objection, it has the burden of introducing sufficient and reliable evidence to prove the necessary facts by a preponderance of the evidence.") (citation omitted).

At sentencing, the government sought to prove that the loss from the bank fraud scheme was $536,982.89.  Its methodology, supported by several charts (e.g., Gov't Ex. 800) and the testimony of an IRS agent, was as follows.

Between 2007 and 2013, followers filed 467 credit card disputes regarding charges billed by the Hindu Temple.  Those disputes totaled $536,982.89.  *See* D.E. 392 at 16.  Only 85 of those disputes—involving 55 individuals and $102,299 in disputed charges—included records detailing the disagreement.  *See id.* at 19–20, 33, 41–42, 44, 46.  Of these 55 individuals, the government considered the testimony or statements of 24: eight who testified at trial; fourteen who were interviewed separately but did not testify; and two who submitted victim impact statements.  *See id.* at 33–34, 37–38.  The agent could not say that the 85 files from the 55 followers

37

demonstrated fraud, but he opined that most demonstrated a similar "pattern" of fraud, consisting of (1) a letter from the Hindu Temple contesting the dispute and containing outlandish claims, (2) an invoice from the Hindu Temple for services rendered, and (3) a certified receipt showing that the follower had received something from the Hindu Temple by certified mail. *See id.* at 18, 38–39, 41, 46. The agent explained that he extrapolated from those 85 files and assumed that all 467 credit card disputes involved fraudulent charges. *See id*. at 42.

Over Mr. Annamalai's objection, the district court relied on this testimony in fixing the loss for the bank fraud charges at greater than $400,000 but less than $1,000,000, resulting in a 14-level enhancement under § 2B1.1(b)(1)(H) of the 2013 Sentencing Guidelines. The district court "sanction[ed] the government's method" and found it "reasonable under the circumstances." D.E. 467 at 123. With the "evidence at the trial" and the evidence presented at sentencing, the court stated that it had "no difficulty at all in finding that the government has carried its burden of showing by a preponderance of the evidence that [Mr. Annamalai] operated a total fraud, so that every penny that ever came into the temple should be included in computing the loss." *Id.* at 122.

The government maintains that this loss range was a conservative estimate because it did not include followers who did not dispute their credit charges, or who paid with something other than a credit card, or who interacted with a different

38

merchant account used by Mr. Annamalai through an entity or third-party that the government "never identified and counted." Gov't Br. at 75. The government also points out that the $536,982.89 loss figure is far below the $10 million that the Hindu Temple received during its operation—an amount the government believes it could have used if one believes, as did the district court, that all funds that came into the Hindu Temple were the result of fraud. *See id.* at 76.

## B

In a number of different sentencing scenarios, our sister circuits have approved of statistical extrapolation or sampling to determine a reasonable estimate of loss. *See, e.g., United States v. Johnson*, 841 F.3d 299, 304–05 (5th Cir. 2014) (extrapolation based on sampling in a tax fraud case); *United States v. Kohlbach*, 38 F.3d 832, 841 (6th Cir. 1994) (extrapolation based on statistical analysis in a case involving a conspiracy to violate the Federal Food, Drug, and Cosmetic Act); *United States v. Scrivener*, 189 F.3d 944, 950 (9th Cir. 1999) (extrapolation based on sampling in a wire fraud case). We agree that where properly performed "[a] statistical estimate may provide a sufficient basis for calculating the amount of loss caused by a defendant," *United States v. Jones*, 641 F.3d 706, 712 (6th Cir. 2011), and hold that the evidence here was sufficient to show a loss of over $100,000 based on the 85 files with documentation. But as we explain, the government's methodology for extrapolating from those 85 files to the 467 disputes "was flawed,"

39

*id.*, and the district court therefore erred in finding that a reasonable estimate of the loss was over $400,000 and less than $1,000,000.

First, contrary to the IRS agent's initial testimony, the extrapolation from the 85 files with documentation to the 467 disputes was not based on the common existence of the "pattern" of fraud found in most of the 85 files. The agent admitted on cross-examination that the "pattern" of fraud was not present in all 467 files, and that essentially the government treated *every* dispute as involving a fraudulent charge by the Hindu Temple. *See* D.E. 392 at 42–43 ("Q. And the way we extrapolated up to this number was anybody who filed a dispute with a credit card company. A. Correct . . . Q: Which is anybody who disputed? A: Right. Q: Even without those three characteristics? A: Right."); *id.* at 49 ("Q: You have nothing other than a merchant account showing that there has been a dispute. A: Correct."). At other times, the agent seemed to say that any of the 467 disputes involved fraud whenever there was a letter from the Hindu Temple contesting the dispute. *See id.* at 77. Under either explanation, however, the government maintained that all 467 disputes involved fraud, even without the three indicators showing a "pattern" of fraud found in most of the 85 files.

Second, the agent said he did not know what the notation "credit not processed"—found on several of the 467 disputes—meant. *See id.* at 65–66 ("I will say I don't know what that means."). He acknowledged, though, that the notation

40

did not indicate fraud.  *Id.* at 83–84.  That notation is therefore of no help to the government.

Third, the agent conceded that the government did not know whether any of the 467 disputes were resolved in favor of the follower or the Hindu Temple.  *See id.* at 84.  Although this may not be determinative, it creates even more uncertainty.  *Cf. United States v. Maurello*, 76 F.3d 1304, 1313 (3d Cir. 1996) ("[U]nsubstantiated complaints voiced by clients only after they have learned of [a] defendant's wrongdoing and their possible right to restitution are unreliable at best, and inherently suspect.  In order to render . . . the estimate a reasonable one . . . the government must demonstrate and the district court must find that the complaints on which it is based are bona fide and can reasonably support a loss determination."), *superseded on other grounds by guideline amendment as recognized in United States v. Aronowitz*, 151 F. App'x 193, 194 (3d Cir. 2005).

Fourth, defense counsel showed the agent a couple of instances in which some of the 467 disputes had been resolved by the follower and the Hindu Temple.  That was the case with victims 30 and 45 on the government's summary chart.  *See* D.E. 392 at 51–52, 54–58.  In one of those cases, the follower apparently just wanted clarification, and eventually told the bank that "this charge is fine."  *Id.* at 54–55.  In another case, a follower authorized charges to her credit card to obtain certain services from the Hindu Temple, but her husband later disputed those charges.  *See*

*id.* at 82. *See also* D.E. 604–05. Despite the testimony that some disputes were resolved and others were based on authorized charges, the government counted these disputes as having involved fraud. The agent hypothesized that some followers might have withdrawn their disputes because they had been threatened by Mr. Annamalai or others, but he did not have any evidence of such behavior for the 467 disputes. *See id.* at 51–52.

In sum, the inferential leap from the 85 documented files (most with a "pattern" of fraud) to the 467 disputes is a step too far. Accepting, as we do, that there was enough evidence for the district court to reach a reasonable estimate of loss of over $100,000 based on the 85 files with documentation, that does not demonstrate by a preponderance of the evidence that *every* single credit card dispute filed against the Hindu Temple involved a fraudulent charge. *See United States v. Stein*, 846 F.3d 1135, 1154 (11th Cir. 2017) (calculating loss amount in a securities fraud case and holding that evidence that several investors relied on the defendant's false press releases, and that press releases were the only place to get information about a certain stock, was insufficient to show that 2,415 investors who bought that stock relied on the press releases).

As noted, the district court believed that Mr. Annamalai had "operated a total fraud," so that "every penny" that ever came into the Hindu Temple "should be included in computing the loss." D.E. 467 at 122. Although we understand the

42

district court's reaction to the fraud that Mr. Annamalai perpetrated, a finding of absolute fraud is not supported by the record. Several followers explained at trial that they received some genuine religious services from the Hindu Temple. One witness testified that she had approved a charge for a horoscope, and only disputed a second duplicate charge. *See* D.E. 382 at 293. Another testified that four ceremonies (or "poojas") were performed with her continued participation on four different dates. *See id.* at 377–79. This is not a case in which all of an entity's transactions were shown to be fraudulent.

In closing, we repeat that in a case like this one the government need only present (and the district court need only determine) a reasonable estimate of loss resulting from the fraud. On this record, however, "far too much speculation is necessary" to conclude that every single credit card dispute filed against the Hindu Temple involved a fraudulent charge. *See Isaacson*, 752 F.3d at 1306. *See also Sepulveda*, 115 F.3d at 890 ("While estimates are permissible, courts must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines.") (internal quotation marks and citation omitted). On remand, the amount of loss for Mr. Annamalai will be set at more than $70,000 but less than $120,000 under § 2B1.1(b)(1)(E) of the 2013 Sentencing Guidelines.

43

## VII

We reject Mr. Annamalai's contentions that the charges against him were improperly joined and that the district court erred in not severing some of those charges. We also conclude that the government's prosecution of Mr. Annamalai for a fraud scheme that he perpetrated through the Hindu Temple did not violate his First and Fourteenth Amendment rights.

Due to insufficient evidence, we reverse the convictions on Counts 10–30 and 34, vacate the sentence, and remand for resentencing. On remand, the loss amount resulting from the fraud offenses will be more than $70,000 but less than $120,000 under the 2013 Sentencing Guidelines.[5]

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR RESENTENCING.**

---

[5] As to most of Mr. Annamalai's other trial and sentencing arguments, we summarily affirm. These include challenges to the district court's evidentiary rulings, the enhancement for the number of victims, the enhancement for abuse of trust, the enhancement for vulnerable victims, the enhancement for sophisticated means, the enhancement for role in the offense, the rulings relating to grouping, and the finding of substantial interference with the administration of justice. Because we have vacated a number of Mr. Annamalai's convictions and found that a loss amount of over $400,000 was not proven by a preponderance of the evidence, and because we are remanding for resentencing, we do not reach two issues—Mr. Annamalai's arguments that the 327-month sentence was substantively unreasonable, and that the restitution for the bank fraud offenses should not have been based on victim impact statements. On remand the district court will resentence Mr. Annamalai and recalculate the restitution that is due.